1          UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
2

3     ------------------------------------------------------------
                                    )
      UNITED STATES OF AMERICA,     )   File No. 13-CR-253
4                                   )              (DWF/TNL)
                Plaintiff,          )
5                                   )
      vs.                           )   Saint Paul, Minnesota
6                                   )   March 3, 2014
      MUSTAFA AHMED MOHAMED, also   )   10:13 a.m.
7     known as MUSTAFA MOHAMED      )
      AHMED,                        )
8                                   )
                                    )
9               Defendant.          )
      ------------------------------------------------------------
10

11          BEFORE THE HONORABLE TONY N. LEUNG
          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                    **(MOTIONS HEARING)**
12

      APPEARANCES
13     For the Plaintiff:        UNITED STATES ATTORNEY
                                 BRADLEY M. ENDICOTT, AUSA
14                               CAROL M. KAYSER, AUSA
                                 300 South Fourth Street
15                               Suite 600
                                 Minneapolis, Minnesota 55415
16
       For the Defendant:        RIVERS LAW FIRM, P.A.
17                               BRUCE M. RIVERS, ESQ.
                                 701 4th Avenue
18                               Suite 300
                                 Minneapolis, Minnesota 55415
19
       Court Reporter:           CARLA R. BEBAULT, RMR, CRR, FCRR
20                               Suite 146 U.S. Courthouse
                                 316 North Robert Street
21                               Saint Paul, Minnesota 55101

22

23

24        Proceedings recorded by mechanical stenography;
      transcript produced by computer.
25

1                              **I N D E X**

2  OFFICER MATTHEW SCHMIDT                                      PAGE
           Direct Examination by Mr. Endicott               22
3          Cross-Examination by Mr. Rivers                  33
           Redirect Examination by Mr. Endicott             37
4          Recross-Examination by Mr. Rivers                44

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      **P R O C E E D I N G S**

2                        **IN OPEN COURT**

3

4              THE COURT:  This the United States District Court

5     for the District of Minnesota and the case before the bench

6     this morning for hearing on a number of motions is captioned

7     as follows:

8              The United States of America versus Mustafa Ahmed

9     Mohamed, and it is case number 13-253.  And at this point,

10    Government, please identify yourself for the record.

11             MR. ENDICOTT:  Good morning, your Honor.

12    Assistant United States Attorney Bradley Endicott for the

13    Government.  With me at counsel table is Assistant United

14    States Attorney Carol Kayser.

15             THE COURT:  Good morning.

16             Mr. Rivers, for Mr. Mohamed.

17             MR. RIVERS:  Bruce Rivers on behalf of Mr. Mohamed

18    who is in the court and in custody.

19             THE COURT:  Good morning, Mr. Mohamed.

20             All right.  There are a number of motions,

21    Mr. Rivers, that have been filed.  The Government has I

22    think one motion.  What I do is, you know, figure out which

23    motions are going to be submitted on the papers and which

24    ones we want live testimony on.  And I know there's a Motion

25    to Dismiss Count 2, I believe.  And then there's some other

1    motions that I don't know which ones you're submitting or

2    not.

3              MR. RIVERS:  Your Honor, before we get to that,

4    there is an issue with regard to representation.

5              THE COURT:  Okay.

6              MR. RIVERS:  I think Mr. Mohamed would probably

7    like to be heard.  Should we approach, your Honor?

8              THE COURT:  Yeah, sure, the lawyers should

9    approach.  The record should reflect that we're having a

10   sidebar regarding the issue related to representation.

11             (Discussion held off the record.)

12             THE COURT:  Back on the record.  Given that

13   it's -- apparently the issue is related to representation, I

14   would ask the Government at this time to leave the courtroom

15   so I can do an inquiry.  Thank you.  And also, of course,

16   the Government witness.

17             (Mr. Endicott and Ms. Kayser and Witness Schmidt

18   exited the courtroom; proceedings filed under seal.)

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5              (Pause in proceedings; end of sealed proceedings.)

6              THE COURT:  The record should reflect that

7     Mr. Endicott, Ms. Kayser, and a person that looks like a

8     legal law enforcement officer is in the back in uniform.  So

9     those three are back in the courtroom and they were outside

10    the earshot of the discussions here in court.

11             So at this time we're proceeding forward with the

12    motions and at this Mr. Rivers, with respect to the motions,

13    what I like to do is let's go through by document number

14    which motions we're submitting on the papers and then

15    specifically which motions we will be having testimony, and

16    then obviously the specific issues that are being challenged

17    with respect to the motions for which we have live

18    testimony.

19             Should we start with Document 13?

20             MR. RIVERS:  As the Government noted, that's moot.

21    In fact, that is moot but if you would like me to go

22    through --

23             THE COURT:  Yeah.  Well, let's just go through

24    them one at a time if you don't mind.

25             MR. RIVERS:  Right.

1    THE COURT:  Because in the end we have to issue an

2    order and, you know, we want to cover everything.  So 13 is

3    moot.  Government's position on that?

4    MR. ENDICOTT:  The Government would agree we're

5    not aware of any confidential informants being used in the

6    case.

7    THE COURT:  If you could slow down and speak a

8    little more clearly.  I was having trouble hearing and the

9    court reporter might have the same issue.

10   MR. ENDICOTT:  Yes, your Honor.  We would concur

11   that the Docket Number 13 is moot.  The Government is not

12   aware of any confidential informants being used in this

13   case.

14   THE COURT:  Okay.  All right.  So Document 14,

15   Defendant's Motion for Disclosure of Rule 404 Evidence.

16   MR. RIVERS:  That's just on the papers, Judge.

17   THE COURT:  The Government, anything else on that?

18   Do you want to submit it on the papers?

19   MR. ENDICOTT:  Nothing further on that, your

20   Honor.

21   THE COURT:  Well, what's the Government's position

22   on that?

23   MR. ENDICOTT:  As we've submitted them on the

24   papers.

25   THE COURT:  All right.  Okay.  Document 15,

1     Defense Motion for Disclosure of Electronic Surveillance,

2     Wiretapping Evidence.  Mr. Rivers.

3               MR. RIVERS:  That motion is moot so just on the

4     papers.

5               MR. ENDICOTT:  We agree, your Honor.

6               THE COURT:  Okay.  Is this being submitted on the

7     papers or is it moot?

8               MR. RIVERS:  Sorry, Judge, it's moot.

9               MR. ENDICOTT:  It's moot.

10              THE COURT:  Can you explain it, please?

11              MR. RIVERS:  Your Honor, when we filed these

12    motions it was prior to receiving discovery in the case and

13    we have learned that there is no wiretapping evidence in the

14    case so it is moot.

15              THE COURT:  The Government, is that your position

16    as well?

17              MR. ENDICOTT:  Yes, your Honor, that is our

18    understanding.

19              THE COURT:  Okay.  Doc 16, Defense Motion for

20    Participation in Voir Dire.  Mr. Rivers.

21              MR. RIVERS:  I think that's a motion that could be

22    better addressed just prior to trial in a Motion in Limine.

23              THE COURT:  The Government, Mr. Endicott?

24              MR. ENDICOTT:  Yes, your Honor.  As we stated in

25    our papers, that's probably more appropriate for a later

1    time during a Motion in Limine.

2              THE COURT:  Mr. Rivers, are you withdrawing that

3    for purposes of this hearing and reserving it for future

4    argument in front of the trial judge?

5              MR. RIVERS:  That's correct, Judge.

6              THE COURT:  Okay.  Doc 16, Defendant's Motion For

7    Early Disclosure of Jencks Act Materials.  Mr. Rivers.

8              MR. RIVERS:  We'd leave that on the paper, Judge.

9              THE COURT:  Government, anything else, or are you

10   relying on the papers?

11             MR. ENDICOTT:  We're relying on the papers.  We

12   would object to any specific order for early disclosure of

13   Jencks material.  Of course the Government will comply with

14   the act as we stated in the papers, your Honor.

15             THE COURT:  Okay.

16             MR. RIVERS:  And, your Honor, I believe that was

17   Document 17 and not 16.

18             THE COURT:  You are correct, Mr. Rivers.  It is

19   Document 17.  I apologize.

20             MR. RIVERS:  I don't mean to correct you, Judge.

21             THE COURT:  That's all right.

22             All right.  Document 18, Defendant's Motion to

23   Compel the Government's Attorney to disclose evidence

24   favorable to the Defendant.  Mr. Rivers, do you want to

25   submit that one on the papers or how do you want to do it?

 1                    MR. RIVERS:  That's correct, Judge.

 2                    THE COURT:  Government, what's your position on

 3     that?

 4                    MR. ENDICOTT:  We'll submit that on the papers as

 5     well, your Honor.

 6                    THE COURT:  Okay.  Doc 19, Motion for Government

 7     Agents to Retain Rough Notes.  The position of the

 8     Government on this?

 9                    MR. ENDICOTT:  Your Honor, as we state in the

10     paper, we believe that the motion is moot.

11                    THE COURT:  How is that?

12                    MR. ENDICOTT:  For Docket Number 19, your Honor?

13                    THE COURT:  19 relating to retention of rough

14     notes.

15                    MR. ENDICOTT:  Oh, excuse me, your Honor.  We

16     would only object to any order with -- concerning disclosure

17     of rough notes.  We have already directed agents to maintain

18     their materials in this investigation.

19                    THE COURT:  Mr. Rivers?

20                    MR. RIVERS:  Rather than being moot, it sounds

21     like they agree the motion should be granted, just on the

22     papers, Judge.

23                    THE COURT:  Sounds like -- well, we'll make a

24     ruling on the papers but it seems to me there's -- the

25     Government is agreeing to retain rough notes.  It's just the

1    use of them that is -- the parties take a different position

2    on.  We'll make a decision based on the submissions.  Thank

3    you.

4              Motion to Suppress Evidence Obtained by Seizure,

5    namely Defendant's cell phone.  Mr. Rivers, do you need

6    testimony on that point?

7              MR. RIVERS:  Yes, your Honor, that's the one issue

8    we will need some testimony on here today.

9              THE COURT:  Okay.  The Government should be

10   prepared to have the witness testify with respect to why it

11   is the Government needs to get a cell phone.  What cell

12   phone -- I mean, I --

13             MR. RIVERS:  If it says cell phone it's an error,

14   Judge.  It was what was obtained from him as a result of the

15   search.  So what was obtained from him was a magazine with

16   one live round in it.

17             THE COURT:  That is covered in another -- in a

18   motion that I'll mention in a moment, I believe.  But this

19   particular Docket 20 seems to relate specifically to

20   documents and cell phone.

21             MR. RIVERS:  There isn't anything like that in

22   this case.  Then we would withdraw that motion.

23             THE COURT:  Okay.  We'll note the withdrawal of

24   that.  And, again, we will be addressing, obviously, the

25   magazine and anything else related to that.

1     Anything else on that, Government, on the

2     documents and cell phone business?

3          MR. ENDICOTT:  Yeah, I believe if it's been

4     withdrawn, we don't have anything further on that, on the

5     cell phone, your Honor.

6          THE COURT:  Okay.  Motion to Sequester in Document

7     21.  Is that similar to the earlier motion with respect to

8     participation in voir dire?  Do you want to handle that the

9     same way, Counsel?

10          MR. RIVERS:  I do, Judge.

11          THE COURT:  Okay.  So we'll withdraw solely for

12     purposes of this hearing, but reserve for subsequent motion

13     with the trial judge.

14          Document Number 22, Motion to Suppress Evidence

15     Obtained by Search and Seizure.  This is the motion that I

16     thought would cover the magazine, things like that.

17          MR. RIVERS:  That's correct.

18          THE COURT:  So specifically we're talking about

19     the magazine and other items seized in connection with the

20     arrest?

21          MR. RIVERS:  That's correct, Judge.

22          THE COURT:  Okay.  Government?

23          MR. ENDICOTT:  That's our understanding, too, your

24     Honor.  In talking with Mr. Rivers last week, the only real

25     issue before the Court today other than the papers is the

1    arrest incident.

2              THE COURT:  Yep.  And then Motion to Suppress

3    Statements.  Were there statements?

4              MR. RIVERS:  I don't believe so.  But to the

5    extent that there are, you know, we would persist in that

6    motion; but I believe that's probably moot if there weren't

7    any.  I don't have any evidence that there were.  I don't

8    know what's going to come out of here today.

9              THE COURT:  Government, statements?  Do we have

10   statements in this one from the Defendant?

11             MR. ENDICOTT:  There is a statement that

12   Mr. Mohamed made during the arrest incident which Officer

13   Schmidt will testify to today, your Honor.  There are also

14   some consensually recorded jail calls that aren't part of

15   the motions record before you, but those will obviously be

16   statements that will be an issue at trial, too.

17             THE COURT:  So we're talking about the statements

18   made in connection with the arrest, whether there's a --

19   they had a right to --

20             MR. RIVERS:  That's correct, your Honor.  We're

21   not making any motion with regard to the jail calls.

22             THE COURT:  Yeah.  Okay.  So I will consider Docs

23   22 and 23 as relating to the incident of arrest.

24             All right.  Next, Defendant's Motion for

25   Suppression of Electronic Surveillance/Wiretapping Evidence.

1   Anything other than what we were talking about the jailhouse

2   materials?

3           MR. RIVERS:  No, your Honor.

4           THE COURT:  Okay.  So are you withdrawing that

5   one?

6           MR. RIVERS:  Yes, your Honor.

7           THE COURT:  Okay.  Government, anything else on

8   that one?

9           MR. ENDICOTT:  Nothing further, your Honor.

10           THE COURT:  Okay.  And last, but not least,

11   Document Number 33, Motion to Dismiss Count 2 of the

12   Indictment on Grounds of Insufficient Allegations and

13   Insufficient Evidence.  And at this time then I assume

14   that's in play.

15           MR. RIVERS:  It is, your Honor, and we'd like

16   testimony on it.

17           THE COURT:  Okay.  All right.  Government,

18   anything else on that?

19           MR. ENDICOTT:  Well, your Honor, I believe that

20   motion is regarding the Indictment itself.  I don't know how

21   we can necessarily respond to the motion challenging the

22   Indictment given that it's hard for the Government to see

23   how there's any information that defense counsel would have

24   to show incompetent evidence.  We would ask the Court to

25   look at that based on the papers in the Government's

 1     response that we submitted on Friday.

 2              THE COURT:  I'll make that decision after I hear

 3     the testimony from the Government's witness; and I would

 4     assume the Government's witness is going to address elements

 5     that are related to Count 2 as well as the other counts.

 6              MR. ENDICOTT:  Okay, your Honor.

 7              THE COURT:  All right.  Thank you.

 8              MR. RIVERS:  Thank you.

 9              THE COURT:  All right.  Those are the lines of the

10     case before Court at this time.

11              Mr. Endicott, first witness.

12              MR. ENDICOTT:  Your Honor, the United States calls

13     Officer Matthew Schmidt.

14              THE CLERK:  Officer, before you take the stand

15     there, please raise your right hand.

16              (Witness Schmidt sworn by the Court.)

17              OFFICER SCHMIDT:  I do.

18              THE COURT:  Thank you.  Please take the stand,

19     watch your step up.

20              Officer, when youare ready to testify, please

21     indicate your readiness by stating and spelling your name

22     for the record, please.

23              THE WITNESS:  My name is Officer Matthew Schmidt.

24     Matthew, M-A-T-T-H-E-W.  Schmidt, S-C-H-M-I-D-T.

25              THE COURT:  Thank you, Officer.  Are you a

1    licensed peace officer?

2              THE WITNESS:  Yes, sir, in the State of Minnesota.

3              THE COURT:  And with what department do you work?

4              THE WITNESS:  The City of Eden Prairie Police

5    Department.

6              THE COURT:  Mr. Endicott.

7                       **DIRECT EXAMINATION**

8    **BY MR. ENDICOTT:**

9    Q.  Officer Schmidt, how long have you been an officer with

10   the Eden Prairie Police Department?

11   A.  Just over six years.

12   Q.  Were you on duty on May 29th, 2013?

13   A.  I was.

14   Q.  Were you dispatched to a call on that date?

15   A.  I was.

16   Q.  Were you dispatched to the address of 13800 Chestnut

17   Drive?

18   A.  Yes.

19   Q.  What was the nature of that dispatch call?

20   A.  The nature of the call was a citizen complaint from a

21   tenant of an apartment building that they said that four

22   black males were in the underground garage smoking

23   marijuana.

24   Q.  What did you do after receiving that dispatch call,

25   Officer Schmidt?

1    A.  I responded to the scene.

2    Q.  Were there any other officers that responded to that

3    scene?

4    A.  There were two others.  It was Officer Kevin Brown and

5    Officer Tyler Quesenberry.

6    Q.  Who was the first to arrive on the scene?

7    A.  Officer Kevin Brown.

8    Q.  And were you the next officer to arrive?

9    A.  Yes, Officer Quesenberry and I arrived at the same time,

10   approximately maybe just a minute after Officer Brown.

11   Q.  Can you describe the scene that you came upon at 13800

12   Chestnut Drive?

13   A.  Yes, Officer Brown was already there.  He was speaking

14   with the group.  There was actually five individuals in

15   front of a parked vehicle inside the underground garage of

16   the apartment building.

17   Q.  Can you describe this underground garage?

18   A.  Yes.  So it's just a typical underground garage to the

19   apartment building.  I believe it kind of has a Y shape to

20   it.  And right when I came in through the stairwell, the

21   group and Officer Brown were maybe 30 feet from me standing

22   in front of two parked vehicles, and then there was a nearby

23   dumpster next to them.

24   Q.  Other than the responding officers and the young

25   gentlemen, were there anyone else inside the garage?

1    A.  Not that I recall.

2    Q.  What happened next?

3    A.  So as I and Officer Quesenberry were approaching Officer

4    Brown, I observed Officer Brown specifically talking to

5    Mustafa Mohamed within the group.  And I heard Officer Brown

6    tell Mr. Mohamed to take his hands out of his pockets; and

7    at that point Mr. Mohamed appeared nervous and was fidgety.

8    Q.  What happened next?

9    A.  So Mr. Mohamed was looking around.  In my experience

10   when someone is, you know, there's a certain level of

11   nervousness that we expect in my job.  When someone talks to

12   a police officer, this is definitely above and beyond

13   tension.  When they are looking around, in my experience,

14   someone is planning on fighting or fleeing from us.  So it

15   kind of raised our suspicion levels.  Officer Brown told him

16   to take his hands out of his pockets multiple times; the

17   hands were coming in and out of the pockets, his front

18   jacket pockets.  And at that point Officer Brown, I believe

19   he did what we call an escort hold.  Just kind of grabbed an

20   arm and walked him to the car that's parked in the adjacent

21   stall to separate him just slightly from the group.

22   Q.  So Mr. Mohamed was not complying with police commands?

23   A.  Correct.

24   Q.  Do you see Mr. Mohamed in the courtroom today?

25   A.  I do.

1    Q.  Seated at defense counsel table?

2    A.  Correct, in the orange suit.

3    Q.  What, if anything, did Mr. Mohamed say to you about

4    marijuana?

5    A.  Well, when Officer Brown separated him -- and due to his

6    behavior, I believe Officer Brown was going to be performing

7    a *Terry* frisk on him.  And I think he told Mohamed that he

8    was going to be searching him; and Mr. Mohamed said at that

9    point, "I can't believe you guys are searching me for a

10   joint."

11   Q.  What happened after that?

12   A.  So while that was going on, simultaneously another

13   member of the group split off and started to walk away

14   essentially from us without direction to do so, and started

15   to act like what I would describe looking around.  And I

16   think the intent was that this other individual was looking

17   like they were looking for this joint that they thought we

18   were concerned about.  And I believe that was a distraction

19   from Officer Brown trying to speak with Mr. Mohamed.

20   Q.  So just to go back, there was one of the five tried to

21   split away from the group?

22   A.  Correct.

23   Q.  Was that Aydiid Isaak?

24   A.  Aydiid, I believe so.

25              THE REPORTER:  Could you spell that for me,

1    please?

2              MR. ENDICOTT:   Spelled A-Y-D-I-I-D, I-S-A-A-K.

3    BY MR. ENDICOTT:

4    Q.  Is that correct?

5    A.  Yes.

6    Q.  So what happened after Mr. Isaak split from the group?

7    A.  So when Mr. Isaak split from the group, he, like I said,

8    walked to a nearby dumpster, was making motions like he was

9    looking around, looking under the dumpster.  We told him to

10   stop.  He would then speak in a different language, which

11   sounded familiar to me like Somali, to Mr. Mohamed.  We told

12   Mr. Aydiid to not speak in another language and to stop

13   looking around and to stop walking away.  He continued to do

14   that and he continued to talk in a foreign language, and

15   then started to look into the -- inside the dumpster at

16   which time Officer Quesenberry and I had to physically stop

17   him and restrain him at the dumpster to prevent him from

18   going and moving away even further.

19   Q.  Before we get into you and Officer Quesenberry's actions

20   with Mr. Isaak, I need to ask, do you or any of the other

21   officers -- did you understand this language that the

22   gentlemen were speaking?

23   A.  As far as comprehend, no.  Though there's a significant

24   Somali population in Eden Prairie and I do have frequent

25   contact with it.  I couldn't say with absolute certainty

1     that was the language, but just off of my previous

2     experience I believe that's what they were speaking.

3     Q.  And, again, who were speaking to each other in the

4     Somali language?

5     A.  It is specifically between Isaak and Mohamed.

6     Q.  After you and Officer Quesenberry got or detained

7     Mr. Isaak, what happened next?

8     A.  So when both my and Officer Quesenberry's attention were

9     fully drawn to Mr. Isaak, I observed Officer Brown was

10    attempting to search Mohamed at which point Mohamed started

11    to walk away from Officer Brown.  And I specifically heard

12    Officer Brown tell him to stop and that he was going to be

13    tased if he did not stop.

14    Q.  When you told Mr. Isaak to stop speaking, did he comply

15    with your orders?

16    A.  No, he did not.

17    Q.  Did Mr. Mohamed comply with Officer Brown's orders to

18    stop?

19    A.  He did not.

20    Q.  What happened next?

21    A.  So, as I previously said, Officer Brown was at the car

22    very next to where the group was originally standing in

23    front of.  It was a minivan that Mr. Mohamed and Officer

24    Brown were standing in front of.  So when Mr. Mohamed

25    started to walk away from Officer Brown, he walked towards

1     what would be the front of the car away from Officer Brown,

2     and then started to circle around the front of that vehicle

3     away from Officer Brown, as he was repeatedly telling him

4     commands to stop or he would be tased.

5     Q.  So did Mr. Mohamed move to an area between two parked

6     cars?

7     A.  Yes.  Once he walked around the front of the van, he

8     walked then in between the two parked vehicles.

9     Q.  What happened then?

10    A.  So at that point Officer Quesenberry had Izaak

11    controlled, so I moved over in between the cars and started

12    to walk towards in between the cars to assist Officer Brown.

13    Q.  And what was Officer Brown telling Mr. Mohamed at this

14    time?

15    A.  Again, repeatedly telling him to stop and that if he

16    didn't stop he would be tased.  At that point, right when I

17    was walking up between the cars, Mohamed was walking between

18    the cars towards me and then he started to crouch down and

19    go to the ground and I saw both his hands go to his front

20    jacket area.

21    Q.  Could you see his hands?

22    A.  I could not.  The underground garage, as it was, was

23    poorly lit and even more so between the two parked cars.  It

24    was extremely dark.  So I could only just see just his rough

25    outline.  Other than his hands going underneath him as he

1    was starting to crouch down.

2    Q.  What did Mr. Mohamed do next after he crouched down?

3    A.  So after he crouched down, Officer Brown deployed his

4    taser and Mohamed yelled out in pain or as if the taser had

5    an effect on him.  So after the taser was deployed, Mohamed

6    at that point, that's when I actually saw his hands go out,

7    up and out to the side as one would expect when

8    surrendering.

9    Q.  What did you do after that?

10   A.  So after the taser was deployed and it completed its

11   cycle, I went and handcuffed Mohamed behind his back,

12   searched just the immediate area behind his back, and then I

13   picked him up and removed him to a nearby stairwell.

14   Q.  Did you find anything on Mr. Mohamed's body?

15   A.  At that moment, no.

16   Q.  Okay.  At what point -- or tell us what did you do next

17   after that?

18   A.  Sure.  So with this whole situation, I removed him just

19   maybe to a, as I said, a nearby stairwell.  I didn't enter

20   the stairwell so I was still inside the underground garage.

21   At that time Officer Quesenberry handcuffed Isaak and then

22   between Officer Brown and Quesenberry we detained the rest

23   of the group until we determined who was going to be a

24   threat and the scene was made safe for us.

25   Q.  And what happened after that?

1    A.  So after everyone was detained and the scene was made

2    safe, I conducted another secondary search of Mohamed.

3    Q.  And how did you conduct this search?

4    A.  So, again, it was kind of more of a *Terry* search where

5    as the initial one was just an immediate area by where his

6    hands were, now I'll kind of search the rest of his body for

7    weapons, guns, knives, anything that is large enough to harm

8    me or my partner.

9    Q.  And what did you find?

10   A.  In his left jacket pocket I found a handgun magazine and

11   a knife.  I believe it was a folding knife.  And in his back

12   pocket I found his license and a license for another

13   individual whom he identified as his brother.

14   Q.  Were there any rounds inside the magazine?

15   A.  There was at least one at the top that I saw.  I did not

16   count the rounds at that time.

17   Q.  But you saw at least one round?

18   A.  Correct.

19   Q.  And were both of these items found inside Mr. Mohamed's

20   jacket left pocket, left front pocket?

21   A.  Correct.

22   Q.  What happened after you recovered these items?

23   A.  So after I recovered those two items, and the rest of

24   the group was, like I said, made safe, then I kind of

25   addressed his taser wounds, so to speak.  So I documented

1     the taser problems with the photograph, removed the probes,

2     and then I just wiped his -- one taser probe went into his

3     middle back.  One went into his belt.  So the one that

4     actually went into his skin, I actually cleaned that area

5     off.  And then at that point I placed him in my squad car.

6     Q.  What, if anything, did Mr. Mohamed say to you when you

7     placed him into your squad car?

8     A.  So as I placed him in my squad car I heard something

9     drop and he said, "Something fell out of my jacket."

10    Q.  And what did you do next?

11    A.  So I had him stand back outside of my squad car and I

12    looked at the floorboard and I saw a loose 9 millimeter

13    round similar to that that was in the magazine.

14    Q.  Did you also recover that round?

15    A.  At that point, yeah, I removed the round and I recovered

16    it.

17    Q.  Officer Schmidt, were any other items recovered that

18    day?

19    A.  Yes.  There was a 9 millimeter handgun recovered

20    underneath the vehicle that Mr. Mohamed was lying next to.

21    Q.  Was that the vehicle that he crouched down next to after

22    he wasn't complying with police commands?

23    A.  That is correct.

24    Q.  And was that handgun a Sig Sauer P229 Elite 9 millimeter

25    handgun?

 1    A.  I believe so, yes.

 2    Q.  And that's a handgun that could shoot the same types of

 3    rounds that you recovered from Mr. Mohamed, correct?

 4    A.  Correct.

 5    Q.  And that handgun had a serial number AJU06044?

 6    A.  I believe so, yes.

 7    Q.  What did you later learn about that handgun?

 8    A.  I later learned that the handgun was stolen and had been

 9    stolen from a business burglary in another city.

10    Q.  Were there any of the other four young men that you

11    encountered that day, were they ever observed next to that

12    area by that car?

13    A.  No.

14    Q.  Was Mr. Izaak ever seen next to that car where the

15    handgun was recovered?

16    A.  He was not.

17    Q.  Officer Schmidt, do you have an idea of how that handgun

18    got there?

19    A.  I do.

20    Q.  And what is that?

21              MR. RIVERS:  Objection, speculation.

22              THE COURT:  Overruled.

23    BY MR. ENDICOTT:

24    Q.  Go ahead and answer.

25    A.  I believe as Mr. Mohamed was going to the ground, that

1    he quickly removed the gun that was in his jacket pocket and

2    it was placed underneath the car.

3    Q.   Okay.  Just one moment, your Honor.

4            THE REPORTER:  Could you spell Quesenberry?

5            THE WITNESS:  Q-U-E-S-E-N-B-E-R-R-Y.

6            MR. ENDICOTT:  No further questions.

7            THE COURT:  Thank you.

8            Mr. Rivers, when you're ready.

9            MR. RIVERS:  Thank you, your Honor.

10                       **CROSS-EXAMINATION**

11   **BY MR. RIVERS:**

12   Q.   Good morning, Officer Schmidt.

13   A.   Good morning.

14   Q.   This was originally a citizen complaint, correct?

15   A.   Correct.

16   Q.   And it was somebody there at the apartment complex who

17   said they smelled some marijuana, right?

18   A.   Correct.

19   Q.   And how many officers respond?

20   A.   To this call it was three.

21   Q.   Three officers.  Why were three responding?

22   A.   Because the original complaint stated that there was

23   four individuals there.

24   Q.   And so how did you gain access to the garage?

25   A.   We have what I call a lockbox there.  Just a fire

1     department, fire box keys that we have access to if we're

2     not able to just follow a citizen inside.

3     Q.  So is this an underground garage?

4     A.  Underground garage.

5     Q.  Made of concrete?

6     A.  Yes.

7     Q.  So when you speak, I suppose your voice kind of echos a

8     little bit?

9     A.  Potentially.

10    Q.  And now did you see anybody smoking any marijuana?

11    A.  I did not.

12    Q.  Did you see anybody throw any marijuana cigarettes?

13    A.  I did not.

14    Q.  Did you see any marijuana on the ground?

15    A.  I did not.

16    Q.  So Mr. Mohamed is standing in an area in the garage with

17    some other gentlemen, correct?

18    A.  Correct.

19    Q.  And all are African-American, right?

20    A.  Yes.

21    Q.  And did you smell marijuana?

22    A.  I don't recall at this point if I did or not.

23    Q.  Well, you didn't put it in your report that you smelled

24    marijuana, right?

25    A.  That's not to say I didn't smell it at the time and I

1    didn't just document it.  I just don't at this time recall

2    that specifically.

3    Q.  Well, let me ask you this specifically.  Did you

4    document that you smelled marijuana in your police report?

5    A.  I did not.

6    Q.  And you never indicate in your report that my client,

7    Mr. Mohamed, smelled like marijuana, correct?

8    A.  Correct.

9    Q.  Now, in fact can you point to any crime that he was

10   committing while he was down there prior to your interaction

11   with him?

12   A.  Prior to any interaction, no.

13   Q.  And so you're there investigating a potential marijuana

14   smell, but you don't know for sure that these boys were

15   smoking marijuana, do you?

16   A.  Not until we go and talk with them, no.

17   Q.  Well, in fact the citizen's complaint didn't identify

18   any particular individual, did it?

19   A.  I don't believe so.

20   Q.  And the person who made the complaint, they are not

21   identified in your reports, correct?

22   A.  They may be listed as a complainant.  I don't -- not in

23   my report.

24   Q.  All right.  And now where were you when you first saw

25   the individuals that you described in your direct testimony?

1    A.  So I came in the stairwell entrance, and it would be

2    maybe 30 feet from the vehicle that the -- the parked

3    vehicle that they were standing in front of.

4    Q.  What kind of vehicle were they standing by?

5    A.  I believe it was like a silver sedan.

6    Q.  All right.  And you indicated that there was some

7    maneuvering by my client, but you never actually saw him

8    place a handgun anywhere, correct?

9    A.  I did not actually witness him place a handgun, no.

10   Q.  But you made the assumption here that that's what he did

11   because it was found close to him, right?

12   A.  Based off of my experience and the circumstances

13   surrounding the situation and where the handgun was found

14   later, I did believe that, yes.

15   Q.  All right.  But you didn't hear anything like a gun

16   hitting the concrete floor, right?

17   A.  No, there was loud verbal commands being yelled by

18   Officer Brown, as well as the taser activated which causes a

19   lot of noise.

20   Q.  In fact, Mr. Aydiid actually came in and said that he

21   placed the gun there; isn't that true?

22   A.  Yes.

23   Q.  And he, in fact, took ownership of the gun, right?

24   A.  Correct.

25   Q.  And he told you that he found it in North Minneapolis,

1    correct?

2    A.  In Minneapolis, yeah.

3    Q.  And that he often hides his gun either under a vehicle

4    or under a dumpster, and sometimes he would even bury it.

5    That's what he told you, right?

6    A.  That's correct.

7    Q.  And you told him that you could be responsible for a

8    crime, right?

9    A.  Correct.

10   Q.  And he knew that but he came forward anyway, correct?

11   A.  Correct.

12   Q.  And you also told him that if you're lying to me, you

13   could also be charged with a crime, right?

14   A.  Correct.

15            MR. RIVERS:  Nothing further, your Honor.

16            THE COURT:  Could both lawyers come up for a

17   sidebar off the record?

18            (Discussion held off the record.)

19            THE COURT:  Government, when you're ready.

20            (Pause in proceedings.)

21                    **REDIRECT EXAMINATION**

22   **BY MR. ENDICOTT:**

23   Q.  Officer Schmidt, I just have some questions going back

24   to your approach of these -- of the five young men.  Do you

25   understand?

1    A.  Yeah.

2    Q.  So you were dispatched to respond to a marijuana call,

3    correct?

4    A.  Correct.

5    Q.  And this was at an underground garage?

6    A.  Correct.

7    Q.  Okay.  Can you describe how the officers gained entrance

8    to this garage first?

9    A.  Yeah.  You know, I don't specifically remember this

10   incident, how we got inside.  But typically for an apartment

11   I explained there is a firebox key that we have access to

12   that has the building keys.  We also have, for certain

13   apartment buildings, have the entry codes if it's been

14   supplied to us that we can use to get inside.

15   Q.  So someone without an entry code, would they not have

16   access to this underground garage?

17   A.  Correct, they would have to follow someone in.

18   Q.  So it's a garage presumably underneath a building or the

19   apartment itself?

20   A.  Yes.  It's a -- it's underneath the apartment building

21   itself, and the only entrances would be the actual drive-in

22   garage door and then the stairwell door.

23   Q.  Okay.  And you mentioned something about a firebox key.

24   Where was this firebox key?

25   A.  Typically the firebox keys are just kept on the exterior

1    of the building as a means of gaining access by police or

2    fire.

3    Q.  And was it Officer Brown that got access to that key

4    presumably?

5    A.  Presumably.  Or again, he could have been let in by a

6    resident.  Or maybe, as I explained, we also have key code

7    access that's provided to us by the apartment buildings.

8    Q.  So when you arrived, was that door already opened or was

9    it closed?

10   A.  I don't recall.

11   Q.  Can you recall how soon in time you arrived after

12   Officer Brown?

13   A.  I would suspect less than a minute.

14   Q.  What is it in your background and training and

15   experience that made you know about how to access that type

16   of garage?

17   A.  Well, this particular apartments we've had a number of

18   calls to.  Our apartment underground garages are frequently

19   hit by car tamper thieves, so we're frequently in the

20   underground garages to take reports of a, say, a car

21   break-in.  So in field training we're shown how to gain

22   access into the apartments.

23   Q.  And now let's go to the actual approach of the young

24   men.  When you approached the young men, did Officer Brown

25   have weapons drawn or taser drawn or anything like that?

1    A.  He didn't have anything drawn.

2    Q.  He was just conversing with these young men?

3    A.  That is correct.

4    Q.  Can you recall what was being said between Officer Brown

5    and the men at that time?

6    A.  I believe the initial conversation I had was more of

7    a -- Officer Brown was trying to just ascertain and

8    requesting that Mohamed keep his hands out of his pockets.

9          THE COURT:  Before we move onto that part, how is

10   it that -- who gives permission for getting into this place?

11         THE WITNESS:  The apartments provide us -- certain

12   apartments provide us access codes to respond inside for

13   calls of service.  In addition, the apartments provide a key

14   that we have a mutual lockbox that we can use to gain access

15   inside to the apartments.

16         THE COURT:  Obviously the apartment is a building.

17         THE WITNESS:  Its's a building.  It's a shared

18   underground garage for all of the residents.

19         THE COURT:  But who gave you permission to use

20   this?

21   BY MR. ENDICOTT:

22   Q.  Is this something that the police department has done in

23   the past, in your training and in your experience?

24   A.  Yeah, in my training and experience the apartment

25   management gives us access to the buildings for the purpose

1    of responding to calls of service.  They would consider it,

2    you know, open access for law enforcement, for fire

3    department personnel, too, to have access to their grounds

4    for means of doing our job.

5    Q.  Have you ever responded to a call at this particular

6    address or that parking garage before?

7    A.  Yeah, numerous times, like I explained, for tampering

8    with auto reports.  We're requested for extra patrol of

9    their underground garages for tamper with auto suspects,

10   suspicious activity, that sort of thing.

11   Q.  So for this particular garage, you have responded to

12   that type of call you just mentioned?

13   A.  Yeah, that and many of other underground garages.

14   Q.  How many times would you say you visited this particular

15   garage for such calls?

16   A.  Over the six years it would be hard for me to put a

17   number on it.  I don't know.  A number of times.  I really

18   don't have a specific number.  More than 10.

19   Q.  And on those past occasions if the garage was closed,

20   how would you gain entry to that garage?

21   A.  Through the lockbox key or the key code access that was

22   provided to us.

23   Q.  And it's your understanding that all of the tenants in

24   that building park their cars in that lot?

25   A.  Correct.

1    Q.  Now, when Officer Brown was --

2              MR. ENDICOTT:  Excuse me, your Honor.  Should we

3    go into the cross, the --

4              THE COURT:  I thought I asked who provided the

5    access code or the key.

6              THE WITNESS:  The access codes are provided to our

7    dispatch center.  I believe there's an officer that -- or a

8    dispatcher that maintains that record and it's the apartment

9    management that gives us that code and that's entered into

10   our computer system so we have access to it as we need it.

11   BY MR. ENDICOTT:

12   Q.  So you would have already had access to that code based

13   on information relayed from the apartment owner as far as

14   the code goes?

15   A.  Yes.

16   Q.  And based on your past experience, you would also have

17   access to the lockbox based on your past entries in response

18   to incidents in that garage?

19   A.  Yes.  The apartment management wants us to have access

20   to their building.

21   Q.  Can you recall which method the officer used to gain

22   entry this time?

23   A.  Like I said, I don't specifically recall how I entered

24   in this moment.

25   Q.  But if the door was closed, it would have been one of

1    those two methods?

2    A.  Yes.

3    Q.  Based on that prior direction from the apartment owner?

4    A.  Correct.

5    Q.  Going back to the incident, Officer Schmidt, did the

6    other officers smell marijuana when they arrived on the

7    scene?

8              MR. RIVERS:  Objection, speculation.

9              THE COURT:  I'll take that as a foundational

10   objection.  Sustained.  And speculation.

11   BY MR. ENDICOTT:

12   Q.  Did the other officers document the smell of marijuana?

13   A.  Yes.

14   Q.  And there were no other groups of young men that were

15   there matching the description from the dispatch call,

16   correct?

17   A.  Correct.

18   Q.  In fact, there were no other groups down there other

19   than these men, correct?

20   A.  Correct.

21             THE COURT:  Well, I'm still sustaining the

22   objection.  Foundation for the -- the answer was yes.

23             MR. ENDICOTT:  Yes, your Honor.

24   BY MR. ENDICOTT:

25   Q.  Officer Schmidt, was a handgun found within the wingspan

1    or arm span of where Mr. Mohamed was down on the ground?

2    A.  It was.

3    Q.  And when Mr. Aydiid came to claim ownership of the

4    handgun, was it during that same day?

5    A.  I believe it was a week later.

6    Q.  He didn't claim any -- he didn't claim ownership or

7    possession of the gun at the scene?

8    A.  At the scene, no.

9           MR. ENDICOTT:  No further questions, your Honor.

10          THE COURT:  Okay.

11                      **RECROSS-EXAMINATION**

12   **BY MR. RIVERS:**

13   Q.  Officer, I just have a couple of questions related to

14   this key and access.  Is this a general key that fits most

15   lockboxes?

16   A.  Yes.

17   Q.  So you don't have a key for every apartment building.

18   It's just one key that fits these particular type of

19   lockboxes, correct?

20   A.  Correct.

21   Q.  And prior to entering the garage, you didn't ask for any

22   permission from the apartment building owner to gain access

23   to the garage, correct?

24   A.  No.  It was a common area of the apartment building and

25   we traditionally wouldn't require permission while we're

1    investigating a potential crime.

2    Q.  Well, this is not an area that's open to the public, is

3    it?

4    A.  It's an open area that is to the residents of the

5    building, and we were called there by a resident.

6    Q.  Okay.  Did you understand my question?

7    A.  I believe so.

8    Q.  Okay.  Is it an area that's open to the public?

9    A.  To the general public, no.

10   Q.  And there's a garage door that locks and you can't get

11   in there unless you have either a -- probably an opener or

12   some device that opens it for you if you're a resident,

13   correct?

14   A.  Correct.

15   Q.  And the person that you called the resident, you don't

16   really know who that person is, do you?

17   A.  I don't know them personally.  I did follow up later and

18   listen to the 911 phone call that this individual made.

19   Q.  Okay.  So when you went in there, you didn't know that

20   the resident's name or who they were or whether they were

21   even a resident of that complex.  You just knew what the

22   dispatcher told you, right?

23   A.  When I receive a call, the name of the caller is on

24   there.  And I believe the call was -- I don't recall

25   specifically if the dispatcher said it was from a resident

1    or not.

2    Q.  Well, the resident didn't meet you outside and say,

3    "There is where they are," did they?

4    A.  No.

5         MR. RIVERS:  Nothing further, your Honor.

6         THE COURT:  Government?

7         MR. ENDICOTT:  Nothing further, your Honor.

8         THE COURT:  Okay.  Thank you.  You may step down.

9         Is the record based solely on the testimony, then?

10   Any other witnesses?

11        MR. ENDICOTT:  No other witnesses.

12        THE COURT:  Okay.  All right.

13        Any other witnesses?

14        MR. RIVERS:  No other witnesses, Judge.

15        THE COURT:  Okay.  All right.

16        Let's get a schedule for briefing.

17        MR. RIVERS:  Are you looking to us?

18        THE COURT:  Yes, the lawyers should probably chat

19   a little bit off the record.

20        (Off the record discussion.)

21        THE COURT:  Okay.  Do you have a proposal on

22   briefing dates and so forth?

23        MR. RIVERS:  Your Honor, we have conferred and if

24   I could have two weeks to get a brief in and then two weeks

25   for the Government to respond.

1          THE COURT:  So that would be the 17th and the

2     31st.  Is that right?

3          MR. RIVERS:  I believe so, Judge.

4          THE COURT:  Okay.  Will you folks be --

5          Counsel, why don't you double check the trial date

6     and contact Judge Frank's scheduling folks to see how things

7     work on that.

8          MR. RIVERS:  Sure.

9          THE COURT:  All right.  Look forward to seeing the

10    briefs.  Thank you.

11         MR. RIVERS:  Thank you.

12         MR. ENDICOTT:  Thank you, your Honor.

13         (Court adjourned at 11:20 a.m.)

14                    *      *      *

15

16

17          I, Carla R. Bebault, certify that the foregoing is

18     a correct transcript from the record of proceedings in the

19     above-entitled matter.

20

21

22          Certified by:  s/Carla R. Bebault
                          Carla Bebault, RMR, CRR, FCRR
23

24

25